H. W. Findley v. Commissioner.
H. W. Findley v. Commissioner
Docket No. 23254.
United States Tax Court
1951 Tax Ct. Memo LEXIS 260; 10 T.C.M. (CCH) 363; T.C.M. (RIA) 51110; April 18, 1951
Sidney B. Gambill, Esq., for the petitioner. Kalman A. Goldring, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax of $160,860.48 for 1943, $193,104.30 for 1944, and $199,364.50 for 1945. The deficiency for 1943 covered also victory tax. The issues for decision are: (1) Whether the petitioner is entitled to a deduction for percentage depletion for 1943 and 1944; (2) whether he is entitled to a deduction for 1945 representing a loss resulting from the digging of a dry well, and (3) whether the Commissioner erred by adding to the petitioner's income, income received by various individuals, partnerships, *261 and a trust. Findings of Fact The petitioner filed his individual income tax returns for the years involved herein with the collector of internal revenue for the twenty-third district of Pennsylvania. The return for 1942 was filed on March 15, 1943 and the return for 1943 was filed on March 14, 1944. The notice of deficiency was mailed March 3, 1949. The petitioner never consented in writing to an extension of the time within which deficiencies for 1942 or 1943 could be assessed or collected. The petitioner was engaged for many years as a salesman for Galion Iron Works and Manufacturing Company, manufacturers of road construction equipment. The petitioner later became distributor for the company and, trading as Galion Machinery Sales Company, a sole proprietorship, he continued to sell Galion equipment and he sold new and used construction equipment manufactured by others. He also leased equipment of this character throughout Pennsylvania and maintained a repair shop. Equipment was sometimes under lease when sold. The petitioner assisted purchasers in leasing their equipment if they so desired. The petitioner continued to operate that business through the taxable years. He promptly *262 discounted all notes which he received from purchasers of equipment. The petitioner became increasingly active, beginning in 1940 and continuing through the taxable years, in the production of coal by the stripping process and devoted a large part of his time to the business. The Kenbrook Coal Company, hereafter called Kenbrook, owned serveral coal leases in Pennsylvania. The petitioner owned no interest in that corporation and was not related to any of its stockholders or officers. He had been stripping coal for the corporation at a flat rate per ton. He entered into a new oral agreement with the corporation on October 1, 1942 which was reduced to writing on January 12, 1943. The agreement continued in effect through March 1944. The parties operated in accordance with that agreement during all of 1943 and the first three months of 1944. The agreement provided that the petitioner was to strip and prepare the coal for sale and Kenbrook was to sell the coal. Kenbrook was to distribute the receipts from sales so as to pay all royalties, insurance, and expenses incident to the stripping and preparation of the coal, to retain for itself 25 cents per ton, plus one-half of any amount *263 in excess of $2.00 per ton received for the coal, and to pay the balance, if any, to the petitioner. The petitioner agreed to make up any deficit if the amount received from the coal was not sufficient to pay the royalties and expenses, plus the amount due Kenbrook. The agreement could be terminated by either party upon 60 days' written notice. The petitioner at the time of entering into that contract agreed with Western Mining and Construction Company, hereafter called Western, that it would do the actual stripping of the coal for him at a flat rate per ton which was originally $1.00 and was apparently increased later to $1.20. The petitioner owned no interest in Western and was not related to any of its stockholders or officers. Over 400,000 tons of coal were stripped under the Kenbrook leases during 1943 and the first three months of 1944 for which Western was paid over $400,000 in accordance with the agreement of the parties. Operations resulted in a deficit for one month which the petitioner was required to pay. The petitioner's share of the total profits under the agreement was about $150,000. The petitioner did not claim deductions for percentage depletion in connection *264 with the Kenbrook operation on his returns for 1943 and 1944. The parties agree that if he is entitled to deductions for percentage depletion in this connection the amounts are for 1943 $41,115,31 and for the first three months of 1944 $6,260.78. The petitioner is entitled to those deductions. Donald C. and Stanley L. Furman owned an oil and gas lease. They sold interests in the lease to several subscribers in order to raise funds necessary for drilling a well on the property. The petitioner purchased a one-fourth interest in the lease for $3,200 and gave his check for that amount to the Furmans on August 11, 1945. The Furmans drilled a well to the required depth but no oil or gas was found and the well was plugged in August 1945 and the lease was abandoned immediately thereafter. Some salvage material was then on hand which was thereafter sold. The value of one-fourth of the salvaged material at the end of 1945 was $568.48 and the Furmans paid the petitioner that amount in 1946 after the material had been sold. The petitioner sustained a loss of $2,631.52 in 1945 from the transaction. He deducted $3,200 on his return for 1945 as a loss from that transaction and the Commissioner, *265 in determining the deficiency, disallowed the deduction. The petitioner reported the $568.48 as income for 1946. The petitioner and his wife, Helen, had four daughters - Mary Louise, born September 4, 1921, Patricia Ann, born February 10, 1923, Gloria Jean, born September 24, 1926, and Dolores Ruth, born January 6, 1930. The petitioner created an irrevocable trust on December 31, 1941 for the benefit of his daughters Gloria and Dolores. He named as trustee R. L. Leitch, a banker, and R. E. Lepas, who had been a business associate of the petitioner since about 1935. Those trustees were not related to the petitioner. They performed their duties as trustees independently of and without being influenced by the petitioner although they sometimes asked his advice along with that of others. The income of the trust was to be accumulated for the daughters until the younger one reached 21 after which it was to be paid to them equally until 1970 when the trust was to be terminated and the corpus distributed equally to the daughters. The property could not revert to the petitioner and he could not benefit from the income or its use. The petitioner retained no power to modify or change the *266 trust. The trustees were authorized to invest the trust corpus in business ventures. The petitioner transferred $10,000 to the trust. The trust then purchased a power shovel from Leitch for $19,400 and later purchased one power shovel and a tractor from the petitioner at a total cost of $22,402 for which payment was made in cash. The trustees negotiated rental contracts and during the years 1942 through 1945 leased the equipment to mining and construction companies. There were five such companies. The petitioner had no interest in two of them. In one he had a one-half interest which terminated on August 31, 1942. The record indicates that he may have had some interest in another but does not indicate whether or not he had any interest in the fifth one. The petitioner did not receive any income from the trust, and was not relieved of any personal obligation by reason of the trust during the taxable years. The Commissioner, in determining the deficiencies, added the following amounts of trust income to the income of the petitioner: Amounts of trust
income included by
the Commissioner
in the petitioner's
Year
income
1942
$17,096.89
1943
38,707.13
1944
37,379.51
1945
37,678.93
*267 That income was not taxable to the petitioner. J. T. Findley, the father of the petitioner, purchased two power shovels and a bulldozer from the petitioner on September 1, 1943 for $46,000. That was a fair price. The father paid the petitioner $10,000 in cash and gave monthly installment notes for the balance. The petitioner discounted the notes and the father later paid the notes. The father was about 74 years of age at the time he purchased that equipment. He was then worth in excess of $100,000, was in good health, and was well able to look after his own business affairs. He lived in his own home separate from the petitioner. The shovels were under lease at the time and the father continued to rent them to the same lessee. He sold the bulldozer for a small profit shortly after he bought it. The petitioner owned no interest in the lessee of the equipment. The petitioner had nothing to do with his father's affairs, did not know the amount of income which the father received from the leasing of the equipment, and in no way benefited from that income. The Commissioner, in determining the deficiencies, included amounts in the petitioner's income to represent the annual rental income *268 which the father received from the two pieces of equipment as follows: Rental income in-
cluded by the Com-
missioner in the
Year
petitioner's income
1943
$15,908.83
1944
35,131.84
1945
55,016.16 He also included $375 in the petitioner's income for 1944 as 50 per cent of the long-term capital gain realized from the sale of the bulldozer. None of that income was income of the petitioner. The petitioner's wife entered into a written "Agency and Management Contract" on January 23, 1943 with Roy A. Paynter and F. D. Woodworth, whereby she made them her agents to manage, rent, and sell coal mining equipment owned by her. The agents were to retain 5 per cent of the income as their compensation and account to her for the balance. Paynter was in the insurance business. Woodworth was in the investment business. Neither was related to the petitioner. Helen transferred $20,000 of her own funds to those agents and they purchased two power shovels from the petitioner on February 3, 1943. The agents leased the shovels. The petitioner was not an owner of an interest in or an officer of any of the lessess although he did assist in the leasing of one of the shovels *269 to one lessee. The agents acted independently of and without being influenced by the petitioner. The agents opened a special bank account and kept separate records of their business activities. They received compensation in accordance with the agreement. The Commissioner, in determining the deficiencies, added to the petitioner's income the following amounts representing income received by Helen through her agents for the years 1943 through 1945: Revised rental in-
come included by the
Commissioner in the
Year
petitioner's income
1943
$37,036.91
1944
40,277.60
1945
46,622.37 None of that income was income of the petitioner. Paynter and Woodworth, as agents for Helen, entered into a partnership agreement with W. R. Mosteller in September 1, 1943, under the name of Fin-Woody Mining and Construction Company, to engage in coal mining and marketing and in the construction of highways, bridges and other projects. The agents were to have a two-thirds interest and Mosteller a one-third interest. The agents contributed $6,000 of capital from funds belonging to Helen and Mosteller contributed $3,000. Mosteller was an experienced contractor. He was associated *270 in a number of business activities with the petitioner. He was not related to the petitioner. The partnership stripped coal for a person who was in no way related to the petitioner. It rented equipment from Helen through her agents and also rented equipment from others, including the petitioner. Mosteller supervised the operations of the partnership. The petitioner never received any income from the partnership and never exercised any control over the operations of the business of the partnership. He contributed neither services nor capital to the partnership. The Commissioner, in determining the deficiencies, included in the petitioner's income, amounts representing Helen's distributive share of the net income of the partnership for 1943, 1944 and 1945 as follows: Distributive share
of partnership income
included in the
Year
petitioner's income
1943
$20,253.70
1944
13,200.96
1945
6,040.46
The petitioner transferred $2,000 to Patricia in 1941. He owed her most, if not all, of that amount by reason of having used money of hers in the past for his own purposes. She then borrowed $2,000 from a bank on her own unsecured note which was not endorsed by *271 the petitioner. She eventually paid off the loan. She bought five used road rollers and two graders from the petitioner on April 23, 1941 for $13,350 which was a fair price for the equipment. She paid $2,670 in cash and gave a series of notes for the balance. The petitioner discounted the notes and Patricia later paid them. She had had at that time a little experience and training in business. The petitioner had introduced her to superintendents working for the Pennsylvania Department of Highways. She leased the equipment to the Pennsylvania Department of Highways under contracts for which she arranged. Her father accompanied her on a few occasions when she met with the representatives of the state but on most occasions he did not. She later made leases of equipment to others, including the petitioner, and sold some of the equipment at a profit. She kept books for her business, insured her equipment, had a separate bank account, rendered social security returns and filed her own income tax returns. The petitioner never controlled her business and never directly or indirectly received any of the income from that business or any benefits from that income. Patricia was married in August *272 1943 to a man named Patterson. The Commissioner, in determining the deficiencies, added to the income of the petitioner the following amounts representing rental income and capital gains from the activities carried on by Patricia: Rental income
Capital gains
included in the
included in the
petitioner's
petitioner's
income by the
income by the
Year
Commissioner
Commissioner
1942
$ 7,480.40
$2,279.72
1943
12,290.12
1944
9,626.35
1,630.53
1945
861.28
1,678.01 Those amounts were not income of the petitioner. The petitioner, desiring to encourage his oldest daughter, Mary, to engage in business, formed an equal partnership with her under the name of East Franklin Coal Company, hereafter called Franklin. The partnership was formed on August 15, 1940 under a written agreement and the fictitious name was duly registered. Each partner contributed $2,000. Mary had received the $2,000 from the petitioner. It represented amounts belonging to her which he had theretofore used for his own purposes. The partnership paid the $4,000 to buy some mining equipment and mineral leases from a third party. The partnership employed W. L. Slupe, who had formerly *273 been a salesman for the petitioner, to manage and supervise its business. The petitioner did not visit the property more than twice during the entire stripping operation. He occasionally discussed the business of his partnership with Slupe over the telephone. The partnership purchased an automobile which Mary used to carry on her duties as a partner, including regular inspections of the mining operations. The partnership was terminated on or about August 31, 1942, at which time the petitioner sold his interest in the business to his daughter, Patricia, for $5,491.22 which was the amount of his capital account on the books of the partnership at that time. Patricia paid the petitioner with her own funds. Mary and Patricia then entered into a new written partnership agreement using the same business name. They agreed to be equal partners. Patricia took an active part in the business of that partnership and Mary continued her activities in the business until some time in 1943 when she moved to New York City. She was married at some time not disclosed in this record to a man named Dennis. Slupe supervised the coal stripping operations of the new partnership. It purchased equipment from *274 the petitioner and from Patricia and leased the equipment. The activities of both partnerships were profitable and the earnings were credited to the accounts of the partners in accordance with the agreement. May and Patricia both withdrew substantial amounts from their shares of the earnings. The petitioner reported in his return for 1942 $8,278.55, his distributive share of the partnership earnings for the period January 1, 1942 to August 31, 1942. The Commissioner, in determining the deficiencies, included the following amounts representing all of the income from both partnerships: Revised partnership
income included
by the Commissioner
in the petitioner's
Year
income
1942
$28,431.92 *
1943
29,229.09
1944
43,741.01
1945
57,545.32
Only the $8,278.55 reported by the petitioner was income to him from the business of the two partnerships. Mary, Patricia, Slupe, and two sisters of the petitioner entered into a written partnership agreement on November 26, 1943 under the name of Parkhill Mining and Contracting Company, hereafter called Parkhill. They agreed to be equal partners to engage in *275 the general mining and contracting businesses. Each partner contributed $3,000, no part of which was furnished by the petitioner. The partnership produced coal for a company in which the petitioner had no interest and with which he was not related. Slupe supervised the coal stripping operations of the partnership and was paid a portion of the profits for his services. The petitioner's sisters desired that the petitioner approve the expenditures of the partnership and he signed a few checks for it. He did not otherwise participate in its activities. He never received any of the income of the partnership. The Commissioner, in determining the deficiencies, added to the income of the petitioner the following amounts representing the distributive shares of Mary and Patricia of the income of Parkhill: Two-fifths of the an-
nual Parkhill income
included by the
Commissioner in the
Year
petitioner's income
1943
$ 3,311.20
1944
25,853.34
1945
6,697.96 No part of those amounts was income of the petitioner. The Commissioner, in adding to the income of the petitioner the amounts set forth above representing income of others from their business operations as *276 individuals, as partners, or as trustees, explained that he had made the adjustment because the petitioner was the real owner of the equipment, the real owner of the business, and/or the real earner of the income resulting from the operation of the business. The petitioner was not the real owner of any of the equipment, the real owner of any of the businesses, or the real earner of any of the income, with the exception of one-half of the Franklin equipment, business, and income for the period of January 1, 1942 to August 31, 1942. The petitioner did not omit from his gross income either for 1942 or 1943 an amount properly includible therein which is in excess of 25 per centum of the gross income stated in his return for that year. Opinion MURDOCK, Judge: The question of whether the petitioner is entitled to depletion deductions for 1943 and 1944 on coal stripped for Kenbrook Coal Company was first raised by an amended petition. The parties are agreed upon the amounts to be deducted if any deductions are allowable. The petitioner claims that he had an economic interest in the coal in place by reason of his contract with Kenbrook and received income from the severance of the mineral *277 to which he had to look for the return of his capital. He cites a number of cases and concludes that he comes within section 29.23(m)-1 of Regulations 111, G.C.M. 22730, C.B. 1941, p. 214, and G.C.M. 26290, C.B. 1950-1, p. 42, since the memoranda held that one who assumes the burden of exploiting the mineral deposit and must look to the income from the sale of the mineral has an economic interest sufficient to entitle him to percentage depletion under section 23 (m). The Commissioner does not refer to the law, his regulations, or any G.C.M. and cites no authority in opposition to the petitioner's contention. He states that the petitioner did not cause any of the Kenbrook coal to be stripped and did not receive the proceeds of coal stripped by Western, but the evidence justifies contrary findings. Apparently he concedes the legal question if the facts are as they have been found. Further discussion seems uncalled for under the circumstances. Decision on this point is for the petitioner. The petitioner claimed a loss of $3,200 from the Furman well digging project, but at the trial the claim was limited to the actual loss of $2,631.52. The only argument of *278 the Commissioner against the deduction is that the petitioner did not "ascertain" the amount of his loss until 1946 when the Furmans reported the net results, after the salvaged material had been sold. He cites no authority. The well was completed in 1945. It was dry and was plugged. The lease was abandoned in 1945. The petitioner paid his contribution of $3,200 in 1945. His loss was sustained in 1945. The amount of his loss was $2,631.52, his total investment, less the salvage value of the material, such as casing, which value was shown by the amount realized from the sale a short time later. Two thousand, six hundred thirty-one dollars and fifty-two cents was deductible for 1945 under section 23 (e) (2). The Commissioner argues that the remainder of this proceeding "involves one and not nine issues as contended by the petitioner in his brief." He relies upon Lucas v. Earl, 281 U.S. 111 and summarizes his brief argument as follows: "Thus, respondent's position is that the record in this case shows that the petitioner, in fact, conducted one integrated business under various names, including East Franklin Coal Company, P. A. Findley Patterson, Parkhill Mining and Contracting *279 Company, Fin-Woody Mining and Construction Company, Helen B. Findley, J. T. Findley, and others. The gross income of this business, regardless of the name which attached to any particular portion thereof, was gross income of the petitioner, and the expenses (including compensation of employees paid as salaries or as a share of the profits) were expenses of the petitioner. Respondent, in his notice of deficiency (Exhibit 'A' attached to the petition), has reached this result by adding to the taxable income of the petitioner the net income of those various portions of this one integrated business which had net income after the payment for services actually rendered, whether such compensation was paid as salaries or as a share of the profits." This argument is refuted by the evidence in the record which shows that the various activities giving rise to the income in question were not carried on by the petitioner as one integrated business, were not controlled by him, and were not profitable because of any services rendered by him. The income in question was not earned, received, or in any sense enjoyed by him. The acts and rights of other individuals and of partnerships in which the *280 petitioner was not a partner can not be ignored wholesale in order to increase the tax of the petitioner merely because he sold equipment to them and was related to the individuals. Since the Commissioner does not rely upon family partnership cases or upon cases such as Helvering v. Clifford, 309 U.S. 331 or Helvering v. Horst, 311 U.S. 112, and does not take up the various arrangements separately, they require no separate consideration here and brief discussion of one or two should suffice. The facts in this case with reference to the trust set up for the two minor daughters is not distinguishable, from the Commissioner's standpoint, from Brown v. Commissioner, 180 Fed. (2d) 926, certiorari denied 360 U.S. 814, and Skemp v. Commissioner, 168 Fed. (2d) 598. Likewise, there is insufficient reason in this record for taxing to the petitioner income for 1943, 1944 and 1945 from the equipment which the petitioner sold to his father in the latter part of 1943. That sale was no tax saving scheme on the part of the petitioner. His father was a well-to-do, experienced, and capable man. He was acting entirely independently of *281 the petitioner and the petitioner had nothing to do with the equipment after the sale. He did not even know the amount of income derived by his father. The petitioner likewise took no part in the business activities conducted by his wife's agents. He helped to start his daughters off in business but thereafter he took no part in their affairs. The fact that all of the various individuals and entities bought some heavy equipment from the petitioner, some of which was then under profitable lease to a third party, is insufficient reason for taxing him with all subsequent income from that equipment, particularly in view of the fact that he regularly sold heavy equipment under profitable lease. Cf. Brown v. Commissioner, supra; Skemp v. Commissioner, supra; Morris Cohen, 15 T.C. 261. The equipment had to be in use to justify its costly ownership and there was apparently good demand for it. The evidence does not disclose sham transactions for the purpose of tax evasion but shows, on the contrary, real transactions in which persons other than the petitioner were the owners of the equipment and the recipients and absolute owners of the income. Since *282 the Commissioner erred in adding the various amounts to the income of the petitioner, the five-year period of limitations on assessment and collection provided in section 275 (c) does not apply with the result that the assessment and collection of any deficiency for 1943 is barred by the statute of limitations. The petitioner does not claim any overpayment for that year. Decision will be entered under Rule 50. Footnotes
*. Includes a short-term capital gain of $25.00.↩